# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| NFINANSE, INC., ) | |
| ) | |
|    Plaintiff, ) | |
| ) | CIVIL ACTION FILE |
| v. ) | |
| ) | NO. 1:11-CV-3728-AT |
| INTERACTIVE ) | |
| COMMUNICATIONS ) | |
| INTERNATIONAL, INC., ) | |
| ) | JURY TRIAL DEMANDED |
|    Defendant. ) | |

## SECOND AMENDED COMPLAINT

## INTRODUCTION AND HORIZONTAL NATURE OF THE INCOMM-NFINANSE RELATIONSHIP

### 1.  [1][1]

In the general purpose reloadable prepaid debit card ("GPR card") market, where the products are functionally similar, price competition is key.  Plaintiff nFinanSe, Inc. ("nFinanSe") is a financial services company in the approximately $100 billion GPR card market.  nFinanSe has become one of the fastest growing companies in the industry, in part, because its GPR cards have the lowest overall fees.  While the entry of nFinanSe into the market has upset some established

---

[1] For ease of the Court's reference, the bracketed paragraph numbers indicate the corresponding allegation in nFinanSe's First Amended Complaint.

players, all of which charge overall higher prices, nFinanSe's agent retailers and their customers have welcomed nFinanSe's high quality, lower overall priced product.

2.

Defendant, Interactive Communications International, Inc. ("InComm"), is a direct horizontal competitor of nFinanSe and other GPR card providers.  InComm provides its own competing "Mio" GPR card, which has higher overall fees, and has prepared to introduce, or already introduced, a new suite of horizontally competing "Vanilla" and "My Vanilla" branded GPR and prepaid products.[2] InComm holds itself out in the marketplace as the provider of the Mio GPR card.[3] Additional information about InComm's Mio GPR card can be found at http://www.incomm.com/products_debitcards.do (accessed on February 16, 2012).

---

[2] Exhibit G is a PowerPoint slide shown by InComm during the March 2011 Prepaid and Financial Services Forum in Orlando, FL detailing a proposed new line of Vanilla-branded products that would horizontally compete with nFinanSe's and other GPR card providers' GPR cards and including InComm's proposed new Vanilla Reload Network.  InComm describes its proposed new My Vanilla card as a "[f]ully functional GPR solution."  *See* Ex. G at 11.

[3] For example, clicking on "Company History" from the Mio GPR card website pulls up a corporate history not of an affiliated company but of InComm itself.  *See* https://www.miocard.com/ContactUs.aspx and http://web.incomm.com/history.do (accessed on Feb. 16, 2012).

958326.1

3.

Exhibits H and I show the horizontally competing GPR cards of nFinanSe and InComm.  One is a MasterCard and one is a Visa.  These cards hang side-by-side in approximately 11,000 retail stores, competing for the consumer's purchase. InComm and nFinanSe also sell competing reload packs for these cards, which also hang side-by-side in approximately 11,000 retail stores, competing for the consumer's purchase.

4.  [2]

In addition to providing GPR cards, InComm also provides its own non-reloadable gift cards and non-reloadable general purpose prepaid cards, which have a higher initial sales price to the consumer.  InComm believes that these other prepaid cards also horizontally and directly compete with nFinanSe's and other providers' GPR cards.

5.

InComm is both a prepaid card provider *and* a distributor of prepaid cards. InComm distributes its own cards and cards from other providers.  InComm is nFinanSe's primary distributor, distributing approximately 90% of the GPR cards nFinanSe provides to retailers.

6.  [3]

Seeing that consumers preferred less expensive cards, such as nFinanSe's, and recognizing that nFinanSe's GPR cards could cannibalize InComm's competing but overall higher-priced cards, InComm began refusing to distribute any more of nFinanSe's Visa-branded GPR cards to new retailers as its distribution contract required it to do.  InComm has ignored the request of at least 10 retail chains that have formally requested to carry nFinanSe's popular Visa-branded GPR cards pursuant to nFinanSe's distribution agreement with InComm.  In doing so, InComm has breached its contract with nFinanSe and significantly curtailed nFinanSe's access to the retail market.

7.

InComm's breach of its distribution contracts was punishment for and a direct result of nFinanSe's refusal to raise its prices, as InComm repeatedly demanded, including by demanding that nFinanSe join InComm's illegal price-fixing conspiracy, the Vanilla Reload Network.  The Vanilla Reload Network is an additional method that consumers can use to add money to their reloadable GPR cards.  To join this network, GPR card providers that horizontally compete with InComm, like nFinanSe, must agree to fix at $3.95 the reload price consumers must pay to add money to their GPR cards in the Vanilla Reload Network.

958326.1

Additional information about InComm's Vanilla Reload Network can be found at https://www.vanillareload.com/home.html (accessed February 16, 2012).

8.

For nFinanSe, this requirement amounted to a demand to increase its reload price by 34% in the Vanilla Reload Network.  If successful in forming and enforcing its price-fixing conspiracy, InComm would largely eliminate the price advantage on the largest recurring GPR card retail fee of one of its fastest-growing competitors, nFinanSe.  InComm's price-fixing agreements with other GPR card providers in the Vanilla Reload Network (an agreement nFinanSe refused to make despite InComm's coercion) constitute a naked restraint of trade and a *per se* violation of the federal antitrust laws.

9.

nFinanSe is suing 1) to prevent InComm, along with other horizontal competitors of nFinanSe, from operating the Vanilla Reload Network in violation of the Sherman Act, 2) for the benefit of the bargains it struck with InComm to distribute nFinanSe's GPR cards, and 3) to prevent InComm from cancelling the parties' distribution contracts or ceasing all business relations with nFinanSe based on nFinanSe's refusal to raise its prices or to engage in an unlawful price-fixing scheme.

958326.1

## PARTIES, JURISDICTION, AND VENUE

### 10.  [6]

nFinanSe is a Nevada corporation with its principal place of business at 3923 Coconut Palm Drive, Suite 107, Tampa, FL 33619.

### 11.  [7]

InComm is a Nevada or Florida corporation with its principal place of business at 250 Williams Street, NW, Suite M100, Atlanta, GA 30303-1032. InComm is qualified and registered to do business in Georgia, maintains its principal place of business in this district, and is thus subject to the personal jurisdiction of this Court.  InComm is subject to service of process by service upon its registered agent, Corporation Service Company, 40 Technology Parkway South, #300, Norcross, GA 30092.

### 12.  [8]

This Court possesses subject-matter jurisdiction over the federal antitrust claim in this action under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. §§ 15, 22.  This court possesses subject-matter jurisdiction over the other claims in this action under 28 U.S.C. § 1332 and 28 U.S.C. § 1367.  The amount in controversy, exclusive of interest and costs, based on nFinanSe's antitrust injuries and InComm's breach of its contracts with nFinanSe exceeds $75,000.

13.  [9]

Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391(b), (c).

## PRINCIPAL ALLEGATIONS

## Industry Background

14.  [10]

nFinanSe is a financial services company that provides general purpose reloadable prepaid cards ("GPR cards").  nFinanSe currently provides Discover- and Visa-branded GPR cards that consumers can purchase in approximately 15,000 retail locations throughout the United States, such as in Dollar General, Winn Dixie, Fred's, and Cumberland Farms stores.

15.  [11]

GPR cards fulfill an important need for the 70+ million Americans who are unable or who decline to use more traditional banking services whether due to poor credit history, recent immigration to the United States, or a desire to avoid high bank fees.

16.  [12]

A GPR card looks like a credit card but functions like a portable bank account.  A consumer purchases a card from a retail outlet and funds the card with

958326.1

an individually selected amount of money (up to a limit).  The consumer may then use the card to make purchases from participating merchants, withdraw cash from ATMs, and make purchases online or by phone.  When the funds on the GPR card run out, the consumer can reload additional funds onto the same card and repeat the process.

17.

Unlike consumer products with only one consumer purchase price, such as a box of cereal, GPR cards have multiple consumer prices.  A consumer pays these prices depending on how much or how long she uses the card.  A consumer pays fees depending on how the consumer uses the card, including a fee to purchase the card (one-time), to reload money onto the card, to maintain the account (monthly), to make ATM withdrawals, and, for some cards, such as InComm's Mio GPR card, to make individual transactions.

18.

All GPR card providers compete on price, card features, overall quality, and customer service.  But because GPR cards all work similarly, GPR card providers fiercely compete on each of the consumer prices associated with a GPR card, i.e. initial purchase price, reload price, monthly maintenance price, ATM fees, and transaction fees.  Two key prices that consumers typically pay by making a

958326.1

purchase at a retail store are the initial purchase price and the recurring reload price.

19.

Exhibit J is a chart illustrating the various prices set by the horizontally competing GPR card providers InComm, nFinanSe, NetSpend, and Green Dot before the Vanilla Reload Network.  *See* Ex. J.

20.

Horizontal competition also exists between a new GPR card and a GPR card reload.  When a consumer wants to put money on a GPR card, she could choose to pay to reload an existing GPR card or to purchase a brand new GPR card.  For example, a consumer could choose to purchase a new nFinanSe GPR card for $3.00 instead of purchasing a reload through the Vanilla Reload Network for $3.95.

21.

Plainly illustrating the horizontal nature of the competition that exists among GPR card providers, Exhibit K shows a GPR card retail display center that InComm has designed for Fred's and that Fred's plans to roll out in its retail stores in June 2012.  It is self-evident that the display contains directly and horizontally competing GPR cards and reloads from six separate companies: InComm

958326.1

(MyVanilla and Mio), Green Dot, NetSpend, PayPal, nFinanSe, and Western Union.

22.  [13]

nFinanSe has established itself as the industry's low-price leader, charging the lowest overall prices in the industry.  nFinanSe charges only $3.00 to purchase its GPR card, $2.95 to reload money onto the GPR card, $2.95 to maintain a monthly account, and $0.99 to make an ATM withdrawal.  Unlike some competitors, nFinanSe charges no signature/PIN transaction fees, offers its customers free employer direct deposit, and offers free 24/7 live-agent customer service.  ConsumersUnion.org and nerdwallet.com have noted favorably nFinanSe's low-price leadership in the GPR card industry.

23.

The goal of InComm's Vanilla Reload Network is, in part, to raise prices within the GPR card market and to eliminate nFinanSe's low-price advantage. Before the Vanilla Reload Network, InComm, NetSpend, and nFinanSe sold reloads for their separate and competing GPR cards for $2.95, $2.99, and $2.95, respectively.  By joining the Vanilla Reload Network, those companies would be required to raise the price of a reload to $3.95 and, through the exclusivity

provision,[4] would be barred from selling any lower-priced reloads in participating Vanilla Reload Network retailers.

### 24.  [14]

Today's GPR card market makes it a practical necessity for GPR card providers, including nFinanSe, to rely on national distributors to place GPR cards in retail chains so the cards can be sold to consumers and to process the activation of a consumer's GPR card.  A GPR card provider's relationship with its distributor is vital to its ability to access the retail market.  Many retailers only carry GPR cards from a *single* distributor because 1) retailers typically desire to minimize the amount of activation technology in their stores (the hardware and software needed to sell GPR cards to consumers) and 2) retailers are often precluded from accepting GPR cards from multiple distribution sources due to an exclusivity agreement with a distributor.

### 25.

Under nFinanSe's distribution contracts with InComm and as a general practice within the industry, neither GPR card providers nor distributors "sell" GPR cards to retailers for "resale."  Instead, GPR card providers and distributors consign the GPR card and reload inventory to retailers, meaning that they give

---

[4] *See* Ex. C ¶ 3.

cards and reload packs to the retailer to sell with the understanding that the retailer will pay the GPR card provider and distributor from the sale proceeds.

26.

Particularly after negotiating a distribution deal with InComm or Blackhawk (the two largest distributors that control the distribution market), who can offer retailers a suite of GPR cards (as well as other prepaid products such as gift cards, prepaid cellular, and prepaid long distance cards) on a single point-of-sale technology platform with a single point for financial settlement and reconciliation, retailers are particularly unlikely to enter into a direct deal with a single GPR card provider.

27.

Five or more years ago, in the GPR card market's infancy when national distributors were not yet focused on the GPR card market, some GPR card providers were successful in establishing direct deals with retailers without a distributor.  Today, relying on direct deals with retailers is generally no longer a viable option for a GPR card provider.

### 28.  [15]

The GPR card distributor market in the United States is dominated by two companies.  InComm is the nation's and the world's largest distributor of prepaid cards.  InComm has approximately 150,000 U.S. partner locations that generated nearly $10 billion in retail sales of prepaid products in 2009.  InComm's retail network features many of the premier brands in the big box, grocery, convenience, chain drug, discount, electronics, office supply and other categories.  Blackhawk Network ("Blackhawk"), a subsidiary of Safeway Inc., is the second largest distributor.  InComm and Blackhawk combine to dominate the GPR card distribution market in the United States.

### nFinanSe's Binding Distribution Contracts

### 29.  [16]

On or about September 21, 2007, nFinanSe entered into a Prepaid Card Distribution, Activation, and Services Agreement with InComm (the "Discover Contract").  *See* Ex. A.  Under that contract, InComm agreed to provide certain services to nFinanSe, including actively distributing nFinanSe's GPR cards, providing card issuance and activation services, and assisting with marketing.  The Discover Contract required InComm to "use commercially reasonable efforts and proceed in good faith to execute the agreement, test the product and launch the

958326.1

Program." *Id.* (Discover Contract) at Ex. B § IV.   Because at the time that nFinanSe executed the Discover Contract it was offering only Discover-branded GPR cards, nFinanSe's written contract refers to the distribution of nFinanSe's Discover-branded cards and includes no specific reference to Visa-branded cards.

## 30.  [17]

On or around October 31, 2008, nFinanSe and InComm executed a written First Amendment to the Discover Contract.  Among other modifications, nFinanSe agreed to assume all of InComm's marketing and promotion obligations (but not distribution or activation) for nFinanSe's GPR cards.   In addition, the parties agreed that "InComm shall arrange for and coordinate account management and maintenance functions at those InComm Retailer locations which notify InComm in writing that they intend to participate in the Program."   Ex. A at First Amendment to Discover Contract, ¶ 2; *see also id.* ¶ 7.

## 31.  [18]

It took InComm more than a full year to successfully launch distribution of nFinanSe's GPR cards under the initial Discover Contract.  After repeated requests by letter from Jerry Welch, nFinanSe's Chairman and CEO, to Brooks Smith, InComm's President and CEO, InComm only began fully distributing nFinanSe's GPR cards in late 2008.

958326.1

32.  [19]

Less than a year after InComm began distributing nFinanSe's Discover-branded GPR cards, nFinanSe secured the ability to offer Visa-branded GPR cards.

33.  [20]

Mr. Welch met with Mr. Smith on or around October 8, 2009 to discuss InComm's distribution of nFinanSe's Visa-branded GPR cards.  In response to Mr. Welch's inquiry about nFinanSe's pending roll-out of Visa-branded GPR cards, Mr. Smith agreed that InComm would distribute nFinanSe's Visa-branded cards and said, "Jerry, if the retailers want your Visa product, then we [InComm] are going to give it to them" (the "Visa Amendment").   Shortly after this oral agreement to add distribution of nFinanSe's Visa-branded GPR cards the parties confirmed in writing all essential terms of the agreement to amend the Discover contract to add InComm's distribution of nFinanSe's Visa GPR cards under the same terms.  *See* Exs. D-E.  In an October 13-14, 2009 email exchange with Mr. Smith, Mr. Welch wrote, "[T]hanks for the approval on our Visa reloadable card; our mutual customers will be excited."  Ex. D.  Mr. Smith responded, "I look forward to continued success."  *Id.*  Subsequent emails among high-ranking executives of the parties confirmed the essential terms of the agreement.  *See* Ex. E.

958326.1

34.  [21]

The Visa Amendment was a valid written amendment that added the distribution of nFinanSe's Visa GPR cards to the Discover Contract pursuant to ¶ 14.10 of the Discover Contract ("[N]o amendment to this Agreement shall be effective or bind any party unless set forth in writing and signed by the duly authorized representatives of the parties."). Ex. A ¶ 14.10.

35.  [22]

In the alternative, the Visa Amendment constituted a new written contract between nFinanSe and InComm for the distribution of nFinanSe's Visa-branded GPR cards pursuant to the terms of the Discover Contract.

36.  [23]

nFinanSe and InComm agreed that any retailer wanting to offer nFinanSe's GPR cards must submit a written request to InComm, which InComm would approve on a case-by-case basis.  The parties required this provision as a mechanism to prevent InComm from distributing nFinanSe's GPR cards, at nFinanSe's behest, to stores that did not want them.  The parties understood that this provision could affect the *timing* of retailer approvals but not the *fact* of retailer approvals.  For example, InComm wanted to protect itself from a promise by nFinanSe that InComm would begin card distribution with insufficient lead time

for InComm to be ready to proceed.  The parties did not understand this provision to serve as the basis for InComm to decline any retailer requests and certainly not any commercially reasonable requests.

### 37.  [24]

The case-by-case notification procedure was consistent with the notification procedure that already existed pursuant to the First Amendment to the Discover Contract at Paragraphs 2 and 7.  *See* Ex. A at First Amendment to Discover Contract ¶ 2 ("InComm *shall* arrange for and coordinate account management and maintenance functions *at those InComm Retailer locations which notify InComm in writing that they intend to participate in the Program*.") (emphasis added); *id.* ¶ 7 ("[InComm shall be] solely responsible for all account management and maintenance functions at InComm Retailers which notify InComm in writing that they intend to participate in the Program.").

### 38.  [25]

InComm's course of performance further confirmed InComm's agreement to distribute nFinanSe's Visa-branded GPR cards in the Visa Amendment.  Since the fall of 2009, InComm has approved and distributed nFinanSe's Visa-branded GPR cards through 7 major InComm retailers having approximately 11,700 locations. nFinanSe and InComm provided the Visa-branded GPR cards to those retailers in

the same manner under the Visa Amendment as the Discover-branded GPR cards had been (and continue to be) distributed under the Discover Contract.

39.  [26]

As further evidence of the Visa Amendment, in late 2010, InComm charged and collected from nFinanSe $65,000 for warehouse security upgrades that InComm told nFinanSe were required *by Visa*.

40.

InComm performed these contracts, approving *every* retailer's request to carry nFinanSe's Visa-branded GPR cards – until around April 2011 – when it became clear to InComm that nFinanSe would not raise its prices and would not join InComm's Vanilla Reload Network if the network included a fixed reload price.

41.

nFinanSe reasonably relied on adding the distribution of its Visa GPR cards to its existing Discover contract, in part, because nFinanSe successfully executed and performed the same type of contract with another large GPR card distributor and because the way the parties added the distribution of nFinanSe's Visa GPR cards was not an unusual industry practice.

958326.1

42.  [27]

On or around July 27, 2009, nFinanSe entered into a similar Card Distribution and Agency Agreement with distributor Coinstar E-Payment Services, Inc. (the "Coinstar Discover Contract").  *See* Ex. B.  The express terms of that contract also only referred to distribution of nFinanSe's Discover-branded GPR cards.

43.  [28]

Just as with InComm, nFinanSe and Coinstar entered into a subsequent agreement whereby Coinstar would also distribute nFinanSe's Visa-branded GPR cards (the "Coinstar Visa Amendment").  Similar to InComm, Coinstar executives stated that distribution of nFinanSe's Visa-branded cards would be covered by the same Coinstar Discover Contract governing distribution of nFinanSe's Discover-branded cards.  Specifically, Coinstar directed its agents to use the same Agency Agreement form from the Coinstar Discover Contract to distribute nFinanSe's Visa-branded cards that they used to distribute nFinanSe's Discover-branded cards.

44.  [29]

nFinanSe and Coinstar also confirmed all essential terms of this agreement in writing.  The Coinstar Visa Amendment was a valid written amendment that added the distribution of nFinanSe's Visa GPR cards to the Coinstar Discover

958326.1

Contract pursuant to ¶ 15.8 of the Coinstar Discover Contract ("[N]o amendment to this Agreement shall be effective or bind any Party unless set forth in writing and signed by the duly authorized representatives of the parties.").  Ex. B.

45.  [30]

In the alternative, the Coinstar Visa Amendment constituted a new written contract between nFinanSe and Coinstar for the distribution of nFinanSe's Visa-branded GPR cards pursuant to the terms of the Coinstar Discover Contract.

46.  [31]

Based on the Coinstar Visa Amendment, Coinstar successfully distributed nFinanSe's Visa-branded GPR cards to 6 major Coinstar retailers having over 2,700 locations and to numerous small Coinstar retailers.

47.  [32]

In or around May 2010, InComm acquired Coinstar's e-payment business, which included Coinstar's services related to the distribution of GPR cards.  As a result of the acquisition, InComm assumed the Coinstar Discover Contract and the Coinstar Visa Amendment to distribute nFinanSe's Discover- and Visa-branded GPR cards thereafter.

### InComm Breached the Visa Amendment To Punish nFinanSe's Refusal to Participate in InComm's Illegal Vanilla Reload Network Price-Fixing Conspiracy

48.  [33]

Before the fourth quarter of 2010, nFinanSe had just begun rolling out its Visa-branded GPR cards in partnership with InComm.  Thus, nFinanSe's sales of those GPR cards remained modest.  In September 2010, at InComm's invitation, senior executives from InComm and nFinanSe met to discuss the introduction of InComm's Vanilla Reload Network and the prospect of expanded opportunities for distributing nFinanSe's GPR cards as a result of nFinanSe joining the Vanilla Reload Network.

49.  [34]

It was also at this September 2010 meeting that nFinanSe received its first hint that InComm wanted to pressure nFinanSe on price.  InComm discussed the prospect of a higher initial sales price for GPR cards and explained its rationale for a higher single price on all reloads (the fee a consumer pays to add money to an already-purchased GPR card) through the Vanilla Reload Network.  One of InComm's senior executives presented research that concluded that nFinanSe would not suffer sales decreases even if nFinanSe raised its price.  Unwilling to

958326.1

entertain any discussion of price among horizontal competitors, nFinanSe's CEO, Mr. Welch, objected to any further unsolicited comments on that subject.

## 50.  [35]

As with many products, the fourth quarter is typically the most important quarter for the sale of prepaid cards due to holiday shopping.  By the end of the fourth quarter of 2010, nFinanSe's Visa-branded GPR cards had been installed in over 12,000 retail stores.  nFinanSe experienced record sales of its GPR cards during this period and had a gross dollar value of retail loads of over $7.2 million on its GPR cards, a 382% increase from the previous fourth quarter.

## 51.  [36]

After the end of the successful 2010 holiday season, nFinanSe learned through communications from InComm that InComm's senior management did not like nFinanSe's lower overall pricing on its GPR cards.  nFinanSe's rapid sales growth was cannibalizing the sale of InComm's competing products.  InComm believed that nFinanSe's GPR cards were not only cannibalizing the sale of InComm's competing Mio GPR card but were cannibalizing the sale of its non-reloadable prepaid card and gift card as well.

52.  [37]

Compounding   InComm's   concern   about   cannibalization,   during approximately the first half of 2011, 10 additional retail chains requested that InComm place nFinanSe's Visa-branded GPR cards in their stores.

53.  [38]

In or around April 2011, InComm began holding up retailers' requests to offer nFinanSe's Visa-branded GPR cards at their stores.

54.  [39]

One of InComm's purported reasons for refusing to process any more Visa requests was that it wanted nFinanSe to join the Vanilla Reload Network, which InComm was in the process of organizing.

55.  [40]

InComm's Vanilla Reload Network would offer consumers a single type of reload method in a participating retail store to add money to an already-purchased GPR card, regardless of the GPR card's brand (or issuer).  But the Vanilla Reload Network also proposed to fix the reload price that different GPR card providers charged to consumers, even though that price may have varied by GPR card provider/brand before then.  InComm anticipated that a substantial number of GPR card providers would join its Vanilla Reload Network.  At present, InComm,

NetSpend, and PayPal have joined, all of which are horizontal competitors in the GPR card market with nFinanSe and each other because they all provide competing GPR cards to consumers.

56.  [41]

InComm made clear throughout its negotiations with nFinanSe and its other horizontal competitors that all Vanilla Reload Network participants were required to charge the Vanilla Reload Network's fixed, uniform reload price of $3.95. InComm's proposed draft of its Reload Services Agreement, sent to nFinanSe for its review, expressly contemplated this uniform reload fee of $3.95.  *See* Ex. C at Ex. C ¶ 1.

57.

In a business meeting about the Reload Network among senior executives from nFinanSe and InComm that occurred between May-June 2011, nFinanSe executive Dan Davis was told by two senior officers of InComm that the Vanilla Reload Network terms that InComm was offering to nFinanSe in the draft Reload Services Agreement were standard terms for Vanilla Reload Network participants and were the same terms that InComm was offering to all other GPR card providers.

958326.1

58. [42]

During the March 2011 Prepaid and Financial Services Forum in Orlando, FL, InComm presented to a select group of retailers its plan to require a uniform reload price of $3.95.

59.

The result of the Vanilla Reload Network is an increase in consumer prices. Before the Vanilla Reload Network, InComm and nFinanSe charged consumers $2.95 per reload. NetSpend charged consumers $2.99 per reload. Having agreed to join the Vanilla Reload Network, InComm and NetSpend now charge consumers $3.95 per reload, an increase of 34% and 33%, respectively. Had nFinanSe joined, it would have been forced to raise its reload price by 34%.

60.

In addition to fixing and raising reload prices, the Vanilla Reload Network contains a mandatory exclusivity provision that bars and removes competing reload products from participating Vanilla Reload Network retailers. *See* Ex. C ¶ 3. The exclusivity provision ensures that no consumer can purchase a less expensive reload product from a GPR card provider participating in the Vanilla Reload Network in a participating retail store.

958326.1

61.

Based on the terms of the Vanilla Reload Network proposed to nFinanSe, the exclusivity provision would prevent a retailer from controlling the GPR card rack in its stores to offer a greater selection of GPR reloads. The Vanilla Reload Network is not pro-competitive because if a retailer wanted to put reload packs from GPR card providers participating in the Vanilla Reload Network, InComm could bar the retailer from doing so under the terms of its contract.

62.

While other GPR card reload networks exist, no other reload network contains an exclusivity provision that similarly bars competing reload products.

63.

One goal of the exclusivity provision is to entrench InComm's own new Vanilla branded suite of prepaid products and to remove horizontally competing brands of reload products from the store shelves of participating Vanilla Reload Network retailers. This line of Vanilla-branded products also expands the extent to which InComm horizontally competes with nFinanSe and the Vanilla Reload Network participants. *See* Ex. G (InComm presentation at March 2011 Prepaid and Financial Services Forum showing its new line of horizontally competing Vanilla-branded products).

64.

For example, as Exhibit L illustrates, before the Vanilla Reload Network, Fred's GPR card retail display offered GPR cards and reloads from InComm, nFinanSe, and Green Dot with reload prices of $2.95, $2.95, and $4.95, respectively.  *See* Ex. L.  nFinanSe's GPR cards and reloads were available on 8 pegs, or one third of the entire rack.  67% of the pegs on this old rack were occupied by card providers offering reloads for $2.95.

65.

After the Vanilla Reload Network, InComm has created a new GPR card retail display at Fred's.  This new display shows how InComm's Vanilla Reload Network has contributed to increased reload prices in the industry and has punished nFinanSe for its refusal to raise its prices or join the Vanilla Reload Network.  *See* Ex. M.

66.

As Exhibit M shows, the reload prices at Fred's after the Vanilla Reload Network are generally markedly higher: InComm ($3.95), Green Dot ($4.95), NetSpend ($3.95), PayPal ($3.95), nFinanSe ($2.95), and Western Union ($4.95). *See* Ex. M.  Compared to 67% before, only *13%* of the pegs on this new rack are occupied by card providers offering reloads for $2.95.  *See* Ex. M.

958326.1

67.

InComm's new GPR card retail display at Fred's also shows in practical terms how InComm, NetSpend, and PayPal have unlawfully coordinated and agreed to a fixed $3.95 reload price for their cards.  Even though the Fred's display rack contains GPR cards sold by six separate and horizontally competing companies, three of those companies have coordinated and fixed the reload price at $3.95.  Each of the other three companies (nFinanSe, Green Dot, and Western Union) has set its own reload price.  *See* Ex. M.

68.

InComm's new GPR card retail display at Fred's also shows how InComm has punished nFinanSe for not agreeing to raise its prices or join InComm's Vanilla Reload Network.  *Even though nFinanSe believes it was the #1 seller of GPR cards at Fred's before the Vanilla Reload Network,* InComm's new retail display 1) cuts in half the number of pegs holding nFinanSe cards and 2) places nFinanSe's cards in the worst position at the bottom of the rack.  *See* Ex. M. InComm has reduced nFinanSe's percentage of the entire rack from 33% to 13%, while keeping InComm's own percentage the same.  This new retail display at Fred's illustrates a partial fulfillment of InComm's threats to punish nFinanSe if nFinanSe did not accede to InComm's demands to raise prices or if nFinanSe sued

InComm to protect its rights.  *See* Ex. N (Oct. 6, 2011 letter of Brooks Smith to Jerry Welch).

69.

InComm's new GPR card retail display at Fred's shows not only how InComm has punished nFinanSe but how InComm has rewarded its flagship Vanilla Reload Network partners, NetSpend and PayPal, by giving them new added retail distribution.  *See* Ex. L (showing Fred's before the Vanilla Reload Network without any NetSpend or PayPal cards).  The reality and gravity of InComm's threats that it would not distribute nFinanSe's Visa GPR cards or continue doing business with nFinanSe if nFinanSe declined to join the Vanilla Reload Network are confirmed and magnified through InComm's act in rewarding NetSpend and PayPal with expanded retail distribution for acceding to InComm's terms and playing ball.

70.

A "neutral" distributor – who was not also selling its own horizontally competing GPR cards and punishing its rival and rewarding its allies – would have no legitimate reason to cut in half and place at the bottom of the retail rack the #1 selling GPR card at Fred's.

71.

Whereas the bulk of InComm's retaliation against nFinanSe had previously been directed at refusing to *expand* distribution of nFinanSe's Visa GPR cards, this Fred's display shows that InComm's retaliation against nFinanSe has also already reached *existing* retail stores where InComm distributes nFinanSe's Visa GPR cards.

72.

Moreover, Fred's represents the *best-case* scenario for consumers.  In most InComm stores, nFinanSe's GPR cards would not merely be at the bottom of the rack, they would be absent altogether.  Only because InComm had already begun distributing nFinanSe's Visa GPR cards to Fred's do nFinanSe's GPR cards currently remain on the rack at Fred's.

73.

InComm has declined to remove nFinanSe's Visa GPR cards from existing retailers because InComm does not want to upset retailers by removing nFinanSe's highly successful product that is popular with the retailers' customers.  Where InComm has not yet distributed nFinanSe's Visa GPR card to retailers and where it is refusing now to do so, *0%* of the pegs on a new rack similar to this one would be occupied by card providers offering reloads for $2.95.

958326.1

74.

As a result of the mandatory fixed reload price set by horizontal competitors and the exclusivity provision that bars the sale of competing, lower-priced products by horizontal competitors that presently exist in the marketplace, the Vanilla Reload Network constitutes an illegal and naked price-fixing conspiracy in violation of federal antitrust law.

75.  [44]

While open to the business concept of a reload network, nFinanSe objected to InComm's demand that it raise and fix its prices and that nFinanSe remove its lower-priced reload products from participating retailers pursuant to the exclusivity provision.

76.

nFinanSe never agreed to join the Reload Network, in principle or otherwise.

77.  [45]

InComm's proposal of a price-fixing agreement through the Vanilla Reload Network was but one of a number of communications by InComm to nFinanSe during 2011 expressing InComm's dissatisfaction with nFinanSe's low prices and conditioning any future business relationship with InComm on nFinanSe's

958326.1

willingness to raise and fix its prices.  Specific instances of these communications include without limitation:

- In January 2011, a member of InComm's financial services team suggested to an nFinanSe executive that, unless nFinanSe raised its pricing, InComm would not likely be going forward with nFinanSe.

- At InComm's 2011 Partner Alliance conference in Miami Beach, FL, a member of InComm's financial services team said to an nFinanSe executive, "If I were you, I'd change my pricing."

- In a telephone conversation on or around May 10, 2011, a member of InComm's senior management said to an nFinanSe executive, "So, I can't sway you on price?"  In addition, regarding the Vanilla Reload Network, the InComm executive then stated that the companies' path forward could not include a reload method that cannibalizes InComm's product.

- On or around May 19, 2011, in a business meeting about the Vanilla Reload Network including members of InComm's sales team, financial services team, and senior management and executives from nFinanSe, nFinanSe asked whether it would receive increased distribution of the Visa-branded cards that InComm was holding up if nFinanSe joined the Vanilla Reload Network (including its price-fixing requirement).  The answer was "yes."

958326.1

78.  [46]

In or around May 2011, when nFinanSe was unresponsive to InComm's entreaties that nFinanSe raise its prices or enter into an illegal price-fixing conspiracy through the Vanilla Reload Network, InComm changed the form but not the substance of the pressure.  InComm continued to attempt to eliminate the price discrepancy between the companies' competing GPR cards and prepaid cards.  Instead of explicit discussions about price, InComm began instead objecting to the "form" of nFinanSe's label.

79.  [47]

nFinanSe's label prominently lists on the front of the package the $3 initial cost for purchasing its GPR card.  nFinanSe offered to revise the front of its packaging label (the complete list of fees was already clearly listed on the back of the package in large print), but nFinanSe would not agree to alter its pricing structure or to raise the price for the GPR card's initial purchase.  nFinanSe also volunteered to (and did) add a note to its packaging stating that its GPR card was not a gift card.  InComm gave no final response to nFinanSe's reasonable offers to revise its packaging.

80.  [48]

nFinanSe also attempted to forge a compromise with InComm about the Vanilla Reload Network, but InComm rejected nFinanSe's proposals.  nFinanSe offered to hang its own reload packages next to the InComm Vanilla Reload Network package on the store display so that nFinanSe could avoid raising its reload price.  InComm declined that request.  nFinanSe also offered to join the Vanilla Reload Network but to maintain its lower reload fee, allowing the Vanilla Reload Network's planned swipe-card technology to perform the simple operation of charging consumers the particular reload fee charged by each GPR card provider.  InComm also declined that request.

81.  [49]

During these discussions and thereafter, in breach of the Visa Amendment, InComm approved no retailers' request to carry nFinanSe's Visa-branded GPR card.

82.  [50]

During and around August and September 2011, InComm's management stopped responding to phone calls and emails from nFinanSe's CEO.

83.  [51]

Finally, in response to an inquiry from nFinanSe's CEO, InComm's CEO informed nFinanSe by letter on or around October 6, 2011 that InComm had decided to cease performance regarding the distribution of any nFinanSe Visa-branded GPR cards to new retailers effective as of September 19, 2011.  It was not until around the time of this communication that InComm affirmatively informed nFinanSe that InComm had decided to no longer abide by the Visa Amendment.

84.  [52]

In response to Mr. Smith's invitation to discuss the dispute, nFinanSe's CEO, Mr. Welch, and Senior VP of Operations, Dan Davis, met with Mr. Smith and Scott Meyerhoff, InComm's CFO, at InComm's office on or around October 17, 2011.  At that meeting, Mr. Smith denied the existence of the Visa Amendment.  He stated that any agreement was the product of promises made by his "people," promises of which he was unaware.  Mr. Smith falsely denied the existence of the Visa Amendment although he knew that he had personally stated InComm's agreement to distribute nFinanSe's Visa-branded GPR cards to the retailers that requested to carry them, had confirmed that agreement in writing, and had personally approved some or all of the written requests submitted to InComm by those retailers.

958326.1

85.  [53]

Just as it warned, after nFinanSe declined to obey InComm's demands that nFinanSe raise its prices and join the Vanilla Reload Network, in a letter sent to nFinanSe's CEO on or around October 6, 2011, InComm's CEO threatened to sever ties with nFinanSe if nFinanSe took any legal action against InComm to protect its interests.  *See* Ex. N at 1 ("InComm has chosen to not launch the nFinanSe GPR cards at any new retailer locations at this time."); *id.* at 2 ("[I]n the unfortunate event that nFinanSe chooses to pursue any such meritless [legal] action, InComm will likely be forced to sever business ties with nFinanSe.").

86.  [54]

Not only would a total severance by InComm breach the Visa Amendment for Visa-branded GPR cards, the Discover Contract for Discover-branded GPR cards, and the assumed Coinstar agreements, but, as CEO of the largest prepaid card distributor in the nation, Mr. Smith's threat constituted the latest in a line of pressure tactics to coerce a newer and smaller horizontal rival to adhere to its demands, including the demand to enter into an illegal horizontal price-fixing conspiracy, or else.

## COUNT ONE – BREACH OF CONTRACT

### 87.  [55]

nFinanSe incorporates herein by reference each and every one of the allegations above.

### 88.  [56]

InComm contracted with nFinanSe to provide distribution, point-of-sale, and other services regarding nFinanSe's Discover- and Visa-branded GPR cards in exchange for compensation from nFinanSe.  All of the contracts referenced herein were binding contracts supported by adequate consideration.

### 89.  [57]

InComm and Coinstar recognized and affirmed the substance of the Visa Amendment and the Coinstar Visa Amendment, respectively.  Both InComm and Coinstar partially performed their contractual obligations to distribute nFinanSe's Visa-branded GPR cards, creating a course of performance that demonstrated their assent to the agreements to distribute nFinanSe's Visa-branded GPR cards.  The parties agreed that the terms of InComm's (or Coinstar's) distribution of nFinanSe's Visa-branded GPR cards would be the same as the terms of InComm's (or Coinstar's) distribution of nFinanSe's Discover-branded GPR cards.

90.  [58]

In 2011, InComm breached the Visa Amendment and the Coinstar Visa Amendment by, without limitation, failing and refusing to distribute any nFinanSe Visa-branded GPR cards to any new retailers, even to retailers that complied with InComm's requirement that it be notified in writing of a retailer's desire to offer nFinanSe's cards.

91.  [59]

Since the commencement of this lawsuit, InComm has, in addition, breached all of its contracts with nFinanSe by, *inter alia*, breaching its account management and maintenance obligations, failing to deal with nFinanSe on a good-faith basis as the parties' contracts require, and by failing to properly distribute nFinanSe's product to a significant number of stores of its largest retailer, Dollar General, during December 2011, which InComm knows is the most important sales month of the year.  As a result, InComm's own Mio GPR card benefitted from the absence of nFinanSe's directly competing Visa GPR card.  InComm's officers and sales employees have, again, ceased communicating with nFinanSe, despite the fact that communication between the parties is necessary for full performance of the contracts.

958326.1

92.  [60]

In addition, departing from past practice, InComm did not invite nFinanSe to InComm's February 2012 Partner Alliance conference, a critical meeting of GPR card providers, pre-paid partners, and retailers.  nFinanSe's presence at this meeting is mandatory for full performance of the parties' contracts: it is the only annual meeting where all of the partners necessary for performing the parties' contracts are assembled in one place to coordinate the sale and distribution of GPR cards.

93.  [61]

InComm's acts described in Paragraphs 59-60 are an apparent partial fulfillment of the threat by InComm's CEO, Mr. Smith, to "sever business ties with nFinanSe" if nFinanSe "file[d] a lawsuit against InComm."  Letter of M. Brooks Smith to Jerry Welch, October 6, 2011.

94.  [62]

nFinanSe has been damaged by InComm's breach of these agreements. InComm's breach has prevented nFinanSe from gaining the benefits of offering its popular Visa-branded GPR cards to any new retailers through InComm's industry-leading distribution network, including to the approximately 10 new retail chains that have requested to carry nFinanSe's Visa-branded GPR cards.  nFinanSe has

958326.1

39
EXHIBIT 1 - 39

also been damaged by its expenditure of resources to prepare for the addition of new retailers carrying nFinanSe's Visa-branded GPR cards, which in the event of InComm's breach have become not only wasted expenditures and losses to nFinanSe's reputation and good will but also false assurances to retailers through no fault of nFinanSe.

95.  [63]

In turn, InComm benefited both from the agreements and from their breach. InComm benefitted through the agreements' performance by, among other benefits, receiving payments from nFinanSe for its distribution services.  InComm benefited from its breach by, among other benefits, harming the business reputation of its horizontal competitor, restricting nFinanSe's retail distribution opportunities, and reducing the number of retailers in which InComm's prepaid cards would have to compete with nFinanSe's lower-overall-priced GPR cards: all of which was part of a devastating punishment for nFinanSe's refusal to fix its prices.

## COUNT TWO – ANTITRUST CONSPIRACY FOR *PER SE* HORIZONTAL PRICE FIXING

96.  [64]

nFinanSe incorporates herein by reference each and every one of the allegations above.

958326.1

97.  [65]

InComm has agreed with horizontal competitors to create a horizontal contract, combination, or conspiracy in restraint of trade that is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

98.  [66]

As independent providers of their own brands of GPR cards, nFinanSe and InComm are horizontal competitors engaged in interstate commerce.   The competitive horizontal relationship is in addition to nFinanSe's vertical distribution relationship with InComm.

99.  [67]

NetSpend and PayPal are GPR card providers that directly and horizontally compete in the sale of GPR cards with InComm and nFinanSe.  These companies' GPR cards that compete with InComm's Mio GPR card (and its forthcoming My Vanilla GPR card) include without limitation the NetSpend Prepaid Visa Card, the NetSpend Prepaid MasterCard, and the PayPal Prepaid MasterCard.

100.

NetSpend is a financial services company that provides GPR cards. NetSpend is a competitor in the consumer GPR card market where it provides Visa and MasterCard Prepaid GPR Cards.  Additional information about these cards is

available       at       https://www.netspend.com/account/about.m       and
https://www.prepaidmastercardnow.com/prepaid-debit-card/applyNow.m.

101.

PayPal is a financial services company that provides a GPR card.  PayPal is
a competitor in the consumer GPR card market where it provides the PayPal GPR
MasterCard.    Additional   information   about   this   card   is   available   at
https://www.paypal-prepaid.com.

102.  [68]

During 2010-11, InComm reached a contractual agreement with NetSpend
and PayPal to fix the reload price paid by consumers in the Vanilla Reload
Network and to exclude any other competing reloads from those companies within
any participating Vanilla Reload Network retailer.

103.  [68]

Before reaching those agreements, on or around May 19, 2011, in a business
meeting in Atlanta with three of InComm's senior officers, InComm told nFinanSe
that NetSpend, American Express, Western Union, and MoneyGram had "all
signed" onto InComm's Vanilla Reload Network with a fixed reload price of
$3.95.

104.  [69]

In addition, in or around September 2011, an InComm senior officer told nFinanSe that Western Union, NetSpend, American Express, and three other companies were "in" the Vanilla Reload Network with a fixed reload price of $3.95.

105.  [70]

At present, InComm's website for the Vanilla Reload Network (www.vanillareload.com) advertises that (1) NetSpend, (2) Mio (InComm's GPR card), and (3) My Vanilla (InComm's prepaid card) are "Participating Prepaid Card Partners" in the Vanilla Reload Network.  *See* Ex. F.

106.

In addition to signing separate Reload Services Agreements with InComm, NetSpend and PayPal knowingly worked together and with InComm to accomplish the common purpose of establishing the Vanilla Reload Network with a fixed reload price and exclusivity provision led by InComm.   As evidenced by InComm's frank discussions with nFinanSe about the terms of the Vanilla Reload Network and by InComm's disclosure of the Vanilla Reload Network's terms at industry conferences, such as the March 2011 Prepaid and Financial Services Forum in Orlando, FL, within the GPR card industry the goals and terms of the

Vanilla Reload Network were commonly known.  *See* Ex. G (slide showing plan by InComm to have $3.95 fixed reload price in Vanilla Reload Network shown at March 2011 Prepaid and Financial Services Forum).

107.

Thus, in addition to contracting or conspiring as horizontal competitors, InComm and the Vanilla Reload Network participants engaged in an unlawful hub-and-spoke contract or conspiracy with InComm as the dominant ringleader.

108.  [71]

As described above, InComm demanded that nFinanSe join this same Vanilla Reload Network and conditioned nFinanSe's participation on nFinanSe's agreement to fix – and in nFinanSe's case to raise – the reload price paid by consumers.

109.  [72]

InComm knowingly and intentionally solicited and agreed with one or more GPR card providers to enter into the price-fixing conspiracy that is the Vanilla Reload Network.

110.  [73]

The Vanilla Reload Network agreement reached between InComm and its GPR card competitors is a horizontal price-fixing contract or conspiracy: the

restraint of trade (the fixed reload fee) is the price paid by consumers who possess different brands of GPR cards, not a vertical "service" charge between InComm and the GPR card providers for the convenience of the Vanilla Reload Network.

111.

InComm's operation of the Vanilla Reload Network and its provision of distribution services are not separate and distinct from its provision of GPR and other prepaid products that directly and horizontally compete with nFinanSe's, NetSpend's, and PayPal's GPR cards.

112.

InComm's role as the Mio and My Vanilla GPR card provider and the Vanilla Reload Network manager are seamlessly integrated.  Led by Robert Skiba and Tim Richardson of InComm, the same InComm Financial Services Department and InComm employees oversee all of the following:  they provide and oversee the operations of InComm's Mio and My Vanilla GPR and other financial services prepaid cards, they manage InComm's relationships with other GPR card providers, they distribute InComm's own and other providers' GPR cards to retailers, and they manage the operation of and InComm's participation in the Vanilla Reload Network.  Further, InComm's sales force is responsible, along

with Financial Services personnel, for selling the Mio and My Vanilla GPR cards and the Vanilla Reload Network to retailers.

113.

Further, InComm, the Mio and My Vanilla GPR cards, and the Vanilla Reload Network are all additionally linked because their operations are governed by the same money transmitter licensors: ITC Financial Licenses, Inc. and IH Financial Licenses, Inc. (i.e., legal entities required to conduct prepaid card business).  Brooks Smith, InComm's CEO, is the CEO of both licensors.  Phil Graves, Mr. Smith's right-hand-man for approximately two decades and a current InComm Executive Vice President, is the Secretary of both licensors.  Compare https://www.miocard.com/ContactUs.aspx ("The Mio Card is distributed and serviced by either ITC Financial Licenses, Inc. or IH Financial Licenses, Inc., depending on the state or territory in which this Card is purchased.") with https://www.vanillareload.com/privacy.html ("ITC Financial Licenses, Inc. and IH Financial Licenses, Inc. . . . each value the relationship we have with our customers.") (accessed on Feb. 16, 2012).

114.  [75]

The price-fixing conspiracy, involving the nation's largest GPR card distributor and multiple national financial companies placing GPR cards in

national and regional retail chains throughout the United States, has occurred in and will substantially affect interstate commerce.

### 115. [76]

The real effect of this naked agreement to fix the reload price in the Vanilla Reload Network will be an increase in prices and a reduction in competition and/or market output at participating Vanilla Reload Network and/or InComm retailers.

### 116. [77]

nFinanSe has suffered injury to its "business or property," 15 U.S.C. § 15(a), as a result of InComm's Vanilla Reload Network conspiracy that fixes the reload price.    nFinanSe would like to be in the Vanilla Reload Network for the competitive advantages that program offers, but, refusing to violate the law as a condition for admission, nFinanSe has suffered a substantial lost business opportunity through its exclusion from the Vanilla Reload Network.  nFinanSe also suffered antitrust injury from InComm's retaliatory acts punishing nFinanSe for its refusal to fix prices.  Because of nFinanSe's refusal to enter into the Vanilla Reload Network in violation of federal antitrust laws, InComm ceased performing its obligations under at least the Visa Amendment (and the Coinstar Visa Amendment), preventing nFinanSe from gaining the monetary benefit of providing its popular Visa-branded GPR cards to any new retailers through InComm's

industry-leading distribution network.   In addition, InComm has threatened to sever all business ties if nFinanSe takes legal action to protect its interests against InComm's antitrust violation.  InComm's severing of all ties with nFinanSe would cause nFinanSe substantial monetary harm and threaten its very commercial viability.

### 117.  [78]

In the event that the Vanilla Reload Network proceeds without nFinanSe's participation, nFinanSe would be effectively locked out of providing its GPR cards to the tens of thousands of retail locations for whom InComm provides distribution services.  Thus, nFinanSe will suffer injury and threatened injury by reason of its refusal to conspire in violation of the antitrust laws.

### 118.  [79]

InComm's attempt to conspire with nFinanSe and its naked agreement to fix prices with one or more of its horizontal competitors is not ancillary to any efficiency-creating joint activity.   Uniform price fixing is neither essential nor necessary to the functionality or success of the Vanilla Reload Network.   Under even a basic swipe-card reload system, it is technologically simple to assign different reload fees to GPR cards from different providers.  A scan-ring system, for example, offers a way to achieve InComm's purported goal of increasing retail

958326.1

rack space while still allowing variable reload pricing.  Or, for example, on information and belief, Western Union's reload network is able to use technological means to charge customers different fees for reloading GPR cards from different providers.

## COUNT THREE – PROMISSORY ESTOPPEL

### 119.  [80]

nFinanSe incorporates herein by reference each and every one of the allegations above.

### 120.  [81]

nFinanSe expended significant resources in the form of employee labor, tangible assets (including without limitation inventory of Visa-branded GPR cards it intended to have distributed by InComm), and reputational capital to recruit new retailers to agree to distribute its Visa-branded GPR cards.  nFinanSe also chose not to pursue distribution agreements with other large distributors, which it could have, in reliance on its agreements with InComm.

### 121.  [82]

InComm should reasonably have expected that its promise to provide nFinanSe with distribution and other services for nFinanSe's Visa-branded GPR

958326.1

cards would induce nFinanSe to incur costs and to give assurances to retailers in preparation for InComm's distribution of cards under the Visa Amendment.

122.  [83]

Injustice can be avoided only by enforcement of InComm's promise to distribute nFinanSe's Visa-branded GPR cards under the Visa Amendment (and the Coinstar Visa Amendment), particularly where InComm breached its agreement as punishment for nFinanSe's refusal to participate in InComm's illegal price-fixing conspiracy.

## COUNT FOUR – DECLARATORY JUDGMENT

123.  [84]

nFinanSe incorporates herein by reference each and every one of the allegations above.

124.  [85]

InComm has formed an illegal price-fixing conspiracy regarding its proposed Vanilla Reload Network by conditioning participation in the network on GPR card providers' agreement to fix their reload fee at $3.95 and by requiring removal of competing reload products through the exclusivity provision.

958326.1

125.  [86]

nFinanSe has refused to participate in InComm's Vanilla Reload Network to the extent that it requires agreement to a price-fixing conspiracy in order to participate.

126.  [87]

nFinanSe has been harmed through InComm's breach of at least the Visa Amendment (and the Coinstar Visa Amendment) based on nFinanSe's refusal to enter into InComm's illegal price-fixing conspiracy.   And, should InComm's Vanilla Reload Network become operational without nFinanSe's participation, nFinanSe will suffer significant injury by being deprived of the opportunity to lawfully participate in a significant business opportunity by the leading GPR card distributor in the United States and nFinanSe's principal distributor.

127.  [88]

nFinanSe seeks a declaratory judgment from this Court holding that the Vanilla Reload Network, or any similar distribution arrangement, to the extent that it bases participation in the network on consent to an illegal price-fixing agreement, is illegal and unenforceable under federal antitrust law.

## COUNT FIVE – PRELIMINARY AND PERMANENT INJUNCTION

### 128.  [89]

nFinanSe incorporates herein by reference each and every one of the allegations above.

### 129.  [90]

Unless the Court enjoins and restrains InComm from seeking to enforce its illegal price-fixing conspiracy and from justifying its breach of the Visa Amendment (or the parties' other contracts) on nFinanSe's refusal to enter into the Vanilla Reload Network, nFinanSe will suffer irreparable and immediate injury, loss, and damage for which it has no adequate remedy at law.

### 130.  [91]

Pursuant to 15 U.S.C. § 26, nFinanSe is entitled to a preliminary and permanent injunction 1) preventing InComm from forming any distribution arrangement, including but not limited to the proposed Vanilla Reload Network, that includes one or more fixed prices as a requirement of participation, 2) preventing InComm from conditioning its performance of the Visa Amendment (or the Coinstar Visa Amendment) on nFinanSe's refusal to enter into an illegal price-fixing conspiracy, and 3) preventing InComm from severing business ties and from

958326.1

terminating its performance of any contract with nFinanSe on the basis of nFinanSe's initiation of this lawsuit.

## COUNT SIX – ATTORNEY'S FEES

### 131.  [92]

nFinanSe incorporates herein by reference each and every one of the allegations above.

### 132.  [93]

InComm is liable to nFinanSe for its costs and attorney's fees incurred in bringing this action.

### 133.  [94]

nFinanSe is entitled to the recover the cost of bringing this suit, including reasonable attorney's fees, as provided by 15 U.S.C. § 15(a).

### 134.  [95]

Alternatively, nFinanSe is entitled to the recover the cost of bringing this suit, including reasonable attorney's fees, as provided by O.C.G.A. § 13-6-11 for InComm's bad faith in conditioning its breach of the Visa Amendment or other contracts on nFinanSe's refusal to enter into an illegal price-fixing scheme and on InComm's CEO's bad faith in denying the existence of any knowledge about the

958326.1

Visa Amendment, an agreement he participated in creating and under which he performed.

135.  [96]

Alternatively, nFinanSe is entitled to recover the cost of bringing this suit, including reasonable attorney's fees, as provided by Art. 13 of the Discover Contract, including its Visa Amendment amendment, or, in the alternative, as provided by Art. 14 of the Coinstar Discover Contract, including its Coinstar Visa Amendment amendment, and assumed by InComm during its acquisition of Coinstar's prepaid card business.

## RELIEF REQUESTED

nFinanSe respectfully asks that this Court:

(a)    conduct a jury trial of all claims and issues as to which there is a right to jury trial;

(b)    enter judgment awarding nFinanSe all general and special damages in an amount to be determined by a jury and trebled as provided by 15 U.S.C. § 15(a);

(c)    enter equitable relief, including without limitation preliminary and permanent injunctive relief in favor of nFinanSe;

958326.1

(d)     award nFinanSe its costs and attorney's fees;

(e)     award nFinanSe pre-judgment and post-judgment interest; and

(f)     order other and further relief as this Court deems proper and just.

Respectfully submitted, this 6th day of April 2012.

/s/ *H. Lamar Mixson*
H. LAMAR MIXSON
Georgia Bar No. 514012
FREDRIC J. BOLD, JR.
Georgia Bar No. 544604

**BONDURANT, MIXSON & ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3417
(404) 881-4100
mixson@bmelaw.com
bold@bmelaw.com

*Attorneys for Plaintiff*

958326.1

## **RULE 7.1D CERTIFICATE OF FONT SIZE**

Pursuant to Local Rule 7.1D of the United States District Court of the Northern District of Georgia, I certify that the foregoing submission was prepared using 14 point Times New Roman font.

/s/ *H. Lamar Mixson*
H. LAMAR MIXSON
Georgia Bar No. 514012

958326.1

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused a true and correct copy of the within and foregoing **SECOND AMENDED COMPLAINT** to be filed with the Clerk of Court using the CM/ECF filing system which will automatically send e-mail notification of such filing to the following attorneys of record:

Debra D. Bernstein
Van A. Anderson
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
TEL: (404) 881-7000
FAX: (404) 881-7777

This 6th day of April, 2012.

/s/ *H. Lamar Mixson*
H. LAMAR MIXSON
Georgia Bar No. 514012

958326.1