IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| NFINANSE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C.A. No. 1:11-CV-3728-AT |
| | ) | |
| INTERACTIVE | ) | |
| COMMUNICATIONS | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT INTERACTIVE COMMUNICATIONS INTERNATIONAL, INC.'S MOTION TO DISMISS PLAINTIFF NFINANSE, INC.'S SECOND AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    INTRODUCTION ...................................................................................1

II.   LEGAL ARGUMENT.............................................................................4

    A.   nFinanSe's Claim for a *Per Se* Illegal Horizontal Price-
    Fixing Conspiracy Must Be Dismissed (Count Two).........................4

        1.   nFinanSe's conclusory allegations of a
        horizontal conspiracy still are insufficient to
        state a *per se* claim............................................................6

            a.   nFinanSe's new allegations regarding
            InComm and Mio do not support a
            plausible inference of a horizontal
            conspiracy.............................................................8

            b.   The SAC does not allege sufficient
            facts to state a claim for a *per se*
            illegal hub-and-spoke conspiracy........................11

        2.   nFinanSe's allegations regarding the
        exclusivity provision do not support its
        claim of a *per se* illegal horizontal
        conspiracy ...........................................................................14

    B.   As a Matter of Law, nFinanSe's Claim for Breach of
    Contract (Count One) Must be Dismissed .........................................17

        1.   nFinanSe's claim for breach of the Alleged
        Visa Agreement is barred by the Statute of
        Frauds ................................................................................17

        2.   nFinanSe's ancillary breach of contract
        theories also fail as a matter of law ...............................18

    C.   As a Matter of Law, nFinanSe's Promissory Estoppel
    Claim (Count Three) Must be Dismissed...........................................19

III.  CONCLUSION......................................................................................21

LEGAL02/33301168v1

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adkins v. Cagle Foods JV, L.L.C.*,
　411 F.3d 1320 (11th Cir. 2005) ........................................................19

*Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*,
　426 F. Supp. 2d 1356 (N.D. Ga. 2006)............................................19

*AT&T Corp. v. JMC Telecom, LLC*,
　470 F.3d 525 (3d Cir. 2006) ..............................................................8

*Augusta News Co. v. Hudson News Co.*,
　269 F.3d 41 (1st Cir. 2001)................................................................5

*Avaya, Inc. v. Telecom Labs, Inc.*,
　Civ. No. 06-2490, 2008 WL 4117957 (D.N.J. Aug. 29, 2008).....................9, 11

*Balmoral Cinema, Inc. v. Allied Artists Pictures Corp.*,
　885 F.2d 313 (6th Cir. 1989) ..............................................................5

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)..........................................................14, 18, 19

*Broad. Music Inc. v. Columbia Broad. Sys. Inc.*,
　441 U.S. 1 (1979)................................................................................5

*Burtch v. Milberg Factors, Inc.*,
　662 F.3d 212 (3d Cir. 2011) ............................................................13

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
　485 U.S. 717 (1988)............................................................................8

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*,
　427 F.3d 1008 (6th Cir. 2005) ..........................................................5

*Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*,
　710 F.2d 752 (11th Cir. 1983) ........................................................17

LEGAL02/33301168v1

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ...........................................................................12

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006) ..............................................................................16

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods. Inc.*,
  129 F.3d 240 (2d Cir. 1997) ............................................................................16

*Flash Elecs., Inc. v. Universal Music & Video Distribution Corp.*,
  312 F. Supp. 2d 379 (E.D.N.Y. 2004) ........................................................16, 17

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
  No. 10 Civ 8(DAB), 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) ...................8

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010) .......................................................................12, 13

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ..............................................................................4

*In re Se. Milk Antitrust Litig.*,
  801 F. Supp. 2d 705 (E.D. Ten. 2011) ...........................................................5, 8

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
  713 F. Supp. 2d 286 (S.D.N.Y. 2010) ...............................................................9

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) .............................................................4, 8, 9, 10

*Johnson v. Univ. Health Servs.*,
  161 F.3d 1334 (11th Cir. 1998) ..................................................................20, 21

*Klusmeier v. Bell Constructors, Inc.*,
  No. 10-15657, 2012 WL 555736 (11th Cir. Feb. 21, 2012) ...............................7

*Kotteakos v. United States*,
  328 U.S. 750 (1946) .........................................................................................12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ...........................................................................................8

iv

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
　No. 2:03 CV 107, 2009 WL 938561 (E.D. Tex. Apr. 6, 2009) ........................11

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
　No. C 08-4548, 2010 WL 145098 (N.D. Cal. Jan. 8, 2010) ..............................14

*Seagood Trading Corp. v. Jerrico*, *Inc.*,
　924 F.2d 1555, 1567 (11th Cir. 1991) ..............................................................17

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
　552 F.3d 430 (6th Cir. 2008) ....................................................................11, 13

*Toys 'R' Us, Inc. v. FTC*,
　221 F.3d 928 (7th Cir. 2000) ...........................................................................12

*United States v. Arnold, Schwinn & Co.*,
　388 U.S. 365 (1967) .........................................................................................16

*Winter Hill Frozen Foods & Servs., Inc., v. Haagen-Dazs Co.*,
　691 F. Supp. 539 (D. Mass. 1988) ...................................................................17

*Yai v. Progressive Bayside Ins. Co.*,
　No. 1:08-CV-1369-JOF, 2009 WL 383362 (N.D. Ga. Feb. 12, 2009) ........19, 20

## RULES

Rule 12(b)(6) ......................................................................................................14

LEGAL02/33301168v1

## I.    INTRODUCTION

This case is before the Court on Defendant Interactive Communications International, Inc.'s ("InComm") Motion to Dismiss Plaintiff nFinanSe, Inc.'s ("nFinanSe") Second Amended Complaint ("SAC").   nFinanSe filed its original complaint on October 31, 2011, asserting claims against InComm for *per se* illegal horizontal price-fixing under Section One of the Sherman Act, 15 U.S.C. § 1, breach of contract, and promissory estoppel.  Dkt. #1.  In lieu of responding to InComm's motion to dismiss that complaint, nFinanSe filed the First Amended Complaint ("FAC"), asserting the same claims and adding factual allegations in an effort to cure the deficiencies in the original complaint.  Dkt. #14.  nFinanSe also filed a Motion for Preliminary Injunction, seeking to enjoin InComm's Vanilla Reload Network on the grounds that it constituted a *per se* illegal horizontal price-fixing agreement.  Dkt. #20.  InComm vigorously opposed nFinanSe's motion, *see* Dkt. #25, and moved to dismiss the FAC, *see* Dkt. #21.

On March 7, 2012, the Court held a hearing on both motions.  At the conclusion of the hearing, the Court held that nFinanSe had not demonstrated a substantial likelihood of success on the merits of the *per se* illegal horizontal price-fixing claim because the agreements between InComm and Program Sponsors participating in the Vanilla Reload Network appeared to be *vertical*, not horizontal,

and therefore were not *per se* illegal.  *See* Hrg. Tr. at 138:18-139:13 (Mar. 7, 2012).  A true and correct copy of the redacted, amended transcript from the March 7, 2012, hearing is attached hereto as Exhibit A.  The Court took InComm's motion to dismiss under advisement.

On April 6, 2012, nFinanSe moved for leave to file the SAC*, see* Dkt. #49, which the Court granted on April 26, 2012, *see* Dkt. #52.  The SAC asserts the same claims, adding only new factual allegations and additional theories of recovery in an attempt to support those claims.  Because the SAC supplements the claims nFinanSe attempted to state in the FAC, and this Court is intimately familiar with the arguments InComm raised in its Motion to Dismiss the FAC, InComm incorporates by reference the entirety of its Motion to Dismiss the FAC, Dkt. #21, its Memorandum of Law in Support of that motion, Dkt. #21-1, and its Reply Brief in further support of that motion, Dkt. #34, which are attached hereto as Exhibits B, C, and D, respectively.  This Memorandum focuses on the new factual allegations in the SAC and shows that none of those allegations saves nFinanSe's claims from dismissal.

With regard to nFinanSe's claim for a *per se* illegal horizontal price-fixing conspiracy, the SAC contains three new theories, each of which is meritless.  First, nFinanSe tries to transform the vertical Reload Services Agreements between

InComm and the participating Program Sponsors into horizontal price-fixing agreements by including irrelevant allegations concerning the overlap in InComm personnel responsible for the Vanilla Reload Network and the Mio card.  nFinanSe made the same misplaced argument in the context of its Motion for Preliminary Injunction.  The Court rejected that argument once already and it should do so again here.   Second, nFinanSe alleges that the executed Reload Services Agreements constitute a *per se* illegal hub-and-spoke conspiracy, notwithstanding that nFinanSe's CEO admitted at the March 7, 2012, hearing that he had *no* evidence that the participating Program Sponsors agreed amongst themselves to set the $3.95 fee for the Vanilla Reload Network.  Not surprisingly, nFinanSe's hub-and-spoke allegations are entirely conclusory and do not support nFinanSe's claim for a *per se* illegal horizontal price-fixing conspiracy.  Third, nFinanSe alleges that the exclusivity provision in the draft agreement sent to nFinanSe, and which was allegedly contained in the executed Reload Services Agreements, is *per se* illegal.  Such exclusivity arrangements are analyzed under the rule of reason and cannot support a claim for *per se* illegal horizontal price-fixing.

nFinanSe's contract claim should also be dismissed.  The SAC is devoid of new allegations to cure the deficiencies in the FAC, which the Court already

suggested "may be fatal." Therefore, for the same reasons set forth in InComm's Motion to Dismiss the FAC, that claim should be dismissed.

nFinanSe's promissory estoppel claim fares no better. The SAC adds allegations in an attempt to plead a plausible promise on which nFinanSe could reasonably rely. However, the e-mails attached to the SAC resoundingly belie the new allegations and foreclose the promissory estoppel claim as a matter of law.

## II.   LEGAL ARGUMENT

### A.   nFinanSe's Claim for a *Per Se* Illegal Horizontal Price-Fixing Conspiracy Must Be Dismissed (Count Two)

Like the FAC, the SAC also asserts a single antitrust claim that the Vanilla Reload Network is *per se* illegal. SAC ¶¶ 96-118. As the Third Circuit has recognized, "[w]hile pleading exclusively *per se* violations can lighten a plaintiff's litigation burdens, it is not a riskless strategy. If the court determines that the restraint at issue is sufficiently different from the *per se* archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010).

*Per se* illegality is reserved for "a very small class of antitrust practices" limited to "horizontal price fixing among competitors, group boycotts, and horizontal market division." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010). Even within the categories that are traditionally *per se*

4

illegal, such as horizontal price-fixing, the Court must closely consider the allegations to determine whether they are part of a "larger, legitimate economic venture." *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001). After all, "price-fixing in its literal sense is not condemned *per se*: virtually every sale is an agreement on price.   The only price-fixing agreements that are condemned *per se* . . . are agreements (1) between competitors (2) as to competing products or services (3) where, in addition, the agreement is not part of a larger, legitimate economic venture." *Id.* (citing *Broad. Music Inc. v. Columbia Broad. Sys. Inc.*, 441 U.S. 1 (1979)); *see also In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 716 (E.D. Ten. 2011) ("*Per se* analysis should not be extended 'to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.'" (quoting *Balmoral Cinema, Inc. v. Allied Artists Pictures Corp.*, 885 F.2d 313, 316 (6th Cir. 1989))).

Accordingly, the *per se* rule does not apply "where the effects of a particular restraint are unclear, even where aspects of the restraint may appear to be facially anticompetitive." *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d at 716; *see also Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005) ("[T]he *per se* rule should be applied only in 'clear cut cases' of trade restraints that are so unreasonably anticompetitive that they present straightforward

5

questions for reviewing courts."). Thus, as discussed at the March 7, 2012, hearing, *per se* illegality is limited to conduct that is plainly and unambiguously anticompetitive—you know it when you see it.

As with its two prior attempts, nFinanSe's third attempt to plead the extraordinary claim of a *per se* illegal horizontal price-fixing conspiracy fails because:  (i) nFinanSe still has not alleged sufficient facts to support an inference of a horizontal agreement; and (ii) the additional allegations regarding the exclusivity provision do not state a claim under a *per se* theory.[1]

### 1.   *nFinanSe's conclusory allegations of a horizontal conspiracy still are insufficient to state a* **per se** *claim*

Because nFinanSe purports to assert a *per se* illegal price-fixing claim, it must include sufficient factual allegations to support a plausible inference of a *horizontal* agreement as to the $3.95 Reload Fee.  nFinanSe alleges that the Reload Services Agreements ostensibly entered between InComm and the Program Sponsors participating in the Vanilla Reload Network constitute *per se* illegal horizontal agreements to fix the Reload Fee.  SAC ¶ 102.  Construing the SAC in

---

[1]   InComm incorporates by reference the arguments in its Memorandum in Support of its Motion to Dismiss the FAC regarding nFinanSe's failure to sufficiently allege antitrust injury.  *See* Ex. B at 17-18.

the light most favorable to nFinanSe, however, those Reload Services Agreements do *not* support a plausible inference of a *per se* illegal horizontal conspiracy.

At the March 7, 2012, hearing, the Court indicated that the Reload Services Agreements were vertical, not horizontal, and that the rule of reason applied:

> [T]his probably has to be looked at as a vertical relationship, or at least . . . not under a *per se* rule. . . . The dominant characteristic of the negotiation . . . and the deal was happening between nFinanSe and InComm itself in its capacity as a generator of this new Vanilla Network. . . . [T]he rule of reason . . . rather than a *per se* rule would likely apply.

Hrg. Tr. 138:18-139:13.

nFinanSe's additional factual allegations in the SAC regarding the relationship between employees working on the Vanilla Reload Network and the Mio card and its conclusory allegations of a hub-and-spoke conspiracy are insufficient to convert the vertical Reload Services Agreements into horizontal agreements.  Therefore, the Court should affirm its prior determination that the rule of reason is the appropriate standard in this case and dismiss Count Two of the SAC with prejudice.[2]

---

[2]     This is nFinanSe's third attempt to state claims against InComm in six months, and nFinanSe's litigation tactics have required InComm to file three motions to dismiss.  The Court should dismiss the SAC *with prejudice*.  *See Klusmeier v. Bell Constructors, Inc.*, No. 10-15657, 2012 WL 555736, at *4 (11th

7

### a.     nFinanSe's new allegations regarding InComm and Mio do not support a plausible inference of a horizontal conspiracy

Whether a challenged practice is horizontal or vertical is dispositive for determining if *per se* analysis is appropriate or whether the practice—like most— must instead be analyzed under the rule of reason.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).  "[T]here is a presumption in favor of a rule-of-reason standard . . . ."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726 (1988).  If an agreement is entirely horizontal, then the *per se* standard may be appropriate in some instances.  However, where there is a vertical element to an agreement, rule of reason applies.  *Leegin*, 551 U.S. at 885; *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d at 719.  Thus, agreements that have both horizontal and vertical elements—sometimes called "dual distribution" or "hybrid" agreements—should be judged under the rule of reason.  *See, e.g.*, *Tempur-Pedic*, 626 F.3d at 1335; *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006); *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, No. 10 Civ 8(DAB), 2011 WL 1044898, at *2 (S.D.N.Y. Mar. 10, 2011) ("[C]laims alleging a vertical relationship or mixed vertical and horizontal relationships must be evaluated under

---

Cir. Feb. 21, 2012) (affirming district court's dismissal of Second Amended Complaint and denial of plaintiff's request for leave to amend).

LEGAL02/33301168v1

the rule of reason."); *Avaya, Inc. v. Telecom Labs, Inc.*, Civ. No. 06-2490, 2008 WL 4117957, at *18-19 (D.N.J. Aug. 29, 2008).  At most, whether such hybrid agreements unreasonably restrain trade depends on "the circumstances of each . . . arrangement [and] whether it more closely resembles a horizontal or vertical agreement." *Tempur-Pedic*, 626 F.3d at 1341 n.5.

Despite nFinanSe's conclusory labeling of the Reload Services Agreements as horizontal,[3] the allegations in the SAC do not support a plausible inference of horizontal agreements.  To the contrary, the SAC highlights the vertical nature of the agreements.  The SAC recognizes that the Vanilla Reload Network offers a new "single type of reload method in [] participating retail store[s] to add money to an already-purchased GPR card, regardless of the GPR card's brand (or issuer)." SAC ¶ 55.  The draft reload services agreement attached to the SAC demonstrates the services that InComm provides to participating Program Sponsors.  InComm is responsible "for all obligations relating to the Vanilla Reload Network," which includes producing and distributing reload packs, soliciting and managing retailers

---

[3]     "While Plaintiff repeatedly asserts that Defendant's conduct constitutes a 'horizontal conspiracy,' and therefore is a *per se* violation, this characterization is a legal conclusion that the Court does not accept as true on a motion to dismiss." *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 290 (S.D.N.Y. 2010).

LEGAL02/33301168v1

in the Vanilla Reload Network, activating reload codes associated with the reload packs, maintaining a call center for processing reloads, promoting the Vanilla Reload Network, etc. *Id.* Ex. C §§ 2.2, 4, 6. As the manager of the Vanilla Reload Network, InComm unilaterally set the $3.95 Reload Fee for reloads through this network. *See id.* ¶¶ 55, 56, 58.

Although the SAC asserts new allegations regarding the overlapping roles of InComm employees involved in the Vanilla Reload Network and InComm's Mio card, *see id.* ¶¶ 111-113, these allegations are plainly irrelevant to whether the Reload Services Agreements are vertical or horizontal. Indeed, the same allegations were before the Court in the context of nFinanSe's Motion for Preliminary Injunction, *see* Second Aff. of Daniel Davis ¶¶ 20-23, Dkt. #36; Hrg. Tr. at 76:6-14, and the Court nevertheless characterized the Reload Services Agreements as vertical, *see* Hrg. Tr. at 138:18-139:13 ("The dominant characteristic of the negotiation . . . and the deal was happening between nFinanSe and InComm itself in its capacity as a generator of this new Vanilla Network."). Moreover, the allegation that the same personnel responsible for the Mio card were responsible for the Vanilla Reload Network does not transform the Reload Services Agreements into horizontal agreements. Dual distribution cases and other cases involving hybrid agreements recognize that a single company (and ostensibly its

employees) may operate at multiple levels within an industry without engaging in *per se* illegal conduct. *See, e.g., PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, No. 2:03 CV 107, 2009 WL 938561, at *6 (E.D. Tex. Apr. 6, 2009), *aff'd* 615 F.3d 412 (5th Cir. 2010); *Avaya*, 2008 WL 4117957, at *18-19. Because the new allegations in the SAC do not support a plausible inference that the Reload Services Agreements are horizontal, Count Two fails as a matter of law.

### b. *The SAC does not allege sufficient facts to state a claim for a per se illegal hub-and-spoke conspiracy*

Recognizing the vertical nature of the Reload Services Agreements, nFinanSe yet again revises its shifting theories of liability to attempt to articulate a "hub-and-spoke conspiracy." [4] SAC ¶¶ 106-107. To establish a *per se* violation under a hub-and-spoke theory, the plaintiff must allege a hub, spoke, *and* rim. "A hub and spoke conspiracy involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy. The rim of the wheel is the connecting agreements ***among the horizontal competitors*** . . . that form the spokes." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 n.3

---

[4]  nFinanSe raised this allegation in support of its Motion for Preliminary Injunction, *see* Dkt. #20-1 at 10-11, which the Court denied at the conclusion of the March 7, 2012 hearing.

11

(6th Cir. 2008) (emphasis added).  "[T]he Supreme Court was clear: a wheel without a rim is not a single conspiracy."  *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) (citing *Kotteakos v. United States*, 328 U.S. 750, 755 (1946)).  Thus, to allege a *per se* illegal hub-and-spoke conspiracy, nFinanSe must sufficiently allege a horizontal agreement **between the Program Sponsors** that agreed to join the Vanilla Reload Network.  *See Toys 'R' Us, Inc. v. FTC*, 221 F.3d 928, 934 (7th Cir. 2000) ("[T]he critical question here is whether substantial evidence supported the Commission's finding that there was a horizontal agreement among the toy manufacturers, with [Toys 'R' Us] in the center as the ringmaster . . . ."); *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (dismissing complaint that "lack[ed] any allegation of an agreement among the [horizontal competitors] themselves").

nFinanSe attempts to allege a *per se* illegal hub-and-spoke conspiracy by asserting a single conclusory allegation that "[i]n addition to signing separate Reload Services Agreements with InComm, NetSpend and PayPal ***knowingly worked together*** and with InComm to accomplish the common purpose of establishing the Vanilla Reload Network with a fixed reload price and exclusivity provision led by InComm."  SAC ¶ 106 (emphasis added).  Based on that threadbare allegation, nFinanSe concludes that "InComm and the Vanilla Reload

Network participants engaged in an unlawful hub-and-spoke contract or conspiracy with InComm as the dominant ringleader." *Id.* ¶ 107.

These allegations are precisely the type of conclusory allegations that are insufficient to state a claim for a horizontal conspiracy. *See Total Benefits*, 552 F.3d at 436 (dismissing *per se* claim for hub-and-spoke conspiracy because "[s]imple allegations . . . , such as a general date of when the conspiracy likely began and that parties are acting in a similar fashion, are insufficient to establish an agreement"); *see also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) (disregarding conclusory allegations that defendants "regularly and unlawfully shared highly confidential information," "reached illegal agreements regarding the terms and conditions to be extended," and "acted in concert").[5]

Not only are nFinanSe's allegations conclusory, they are also directly contradicted by the sworn testimony of Jerry Welch, CEO of nFinanSe, presented

---

[5]    For the same reason, this Court should not accept as true nFinanSe's other conclusory allegations, such as the allegation that "During 2010-11, InComm reached a contractual agreement with NetSpend and PayPal to fix the reload price paid by consumers in the Vanilla Reload Network and to exclude any other competing reloads from those companies within any participating Vanilla Reload Network retailer." SAC ¶ 102.

13

to this Court at the March 7, 2012, hearing.[6]   When asked whether he had "any evidence that NetSpend and PayPal agreed amongst themselves to set the $3.95 fee for the Vanilla Reload Network," Mr. Welch responded "No."  Hrg. Tr. 132:9-12. nFinanSe's claim is precisely the type of antitrust claim the Supreme Court had in mind when it decided *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). In keeping with *Twombly*, the Court must reject nFinanSe's attempt to state a Section One claim based on a hub-and-spoke theory.

### 2.    nFinanSe's allegations regarding the exclusivity provision do not support its claim of a per se illegal horizontal conspiracy

In an attempt to buttress the *per se* claim, the SAC adds allegations regarding the exclusivity provision in the draft reload services agreement attached as Exhibit C.  Even assuming that each executed Reload Services Agreement

---

[6]    Although the Court is generally restricted to the complaint and attached Exhibits on a Rule 12(b)(6) motion, the Court is permitted to "take judicial notice of admissions and concessions already made in this action."  *See Realnetworks, Inc. v. DVD Copy Control Ass'n*, No. C 08-4548, 2010 WL 145098, at *4 (N.D. Cal. Jan. 8, 2010).   Additionally, because nFinanSe stated that the SAC "incorporate[d] into the pleadings the material facts that nFinanSe has learned through the affidavits before the Court [and] the March 7, 2012 evidentiary hearing," Dkt. #49 at 3, the doctrine of incorporation permits the Court to "consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.'"  *Realnetworks*, 2010 WL 145098, at *4 n.7 (considering testimony and documents submitted at hearing on motion for preliminary injunction in deciding Rule 12(b)(6) motion to dismiss a later-amended complaint).

contains such a provision,[7] these allegations do not make nFinanSe's claim for a *per se* illegal horizontal conspiracy any more plausible.

First, nFinanSe's allegations concerning the effect of the draft exclusivity provision are plainly at odds with the provision itself. The text of this draft provision reads as follows:

> <u>Exclusivity</u>. Each of Program Manager and the Issuing Bank will not, and will ensure that each of their respective Affiliates do not, during the Term and for one (1) year immediately following the Term, directly or indirectly enter into an agreement or other arrangement with any InComm Retailer, other than through InComm or its Affiliate, for the marketing, promotion, distribution or sale of any product or service which may be used to add value to any stored value card or other access device, including, without limitation, a Card.

SAC Ex. C § 3. This provision does not "bar[] and remove[] competing reload products from participating Vanilla Reload Network retailers," as nFinanSe erroneously asserts. *Id.* ¶ 60. Exhibit K to the SAC is proof positive that reload products for non-participating GPR Cards remain on the shelves at InComm Retailers. The draft exclusivity provision merely prohibits participating Program Sponsors from free-riding on the goodwill InComm has built with its Retailers and doing an end-run around InComm by using other routes to distribute their reload

---

[7]    InComm disputes that the executed Reload Services Agreements are identical to the draft agreement attached to nFinanSe's complaints but, for purposes of this motion, accepts nFinanSe's allegation as true.

products into InComm's Retailers once they join the Vanilla Reload Network. This draft provision would prevent nFinanSe—if it were to join the Vanilla Reload Network—from unilaterally entering into a separate agreement with an InComm Retailer for the distribution of its reload packs.  However, nFinanSe, the Retailer, and InComm could enter into an agreement allowing nFinanSe-branded reload packs to "hang on the shelf" next to Vanilla Reload Network reload products.[8]

In any event, the draft exclusivity provision is nothing more than an exclusive distribution agreement and is not *per se* illegal as a matter of law.  To the contrary, "exclusive distributorship arrangements are presumptively legal," and are analyzed under the rule of reason.  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods. Inc.*, 129 F.3d 240, 245 (2d Cir. 1997); *see also United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376 (1967) ("[A] manufacturer of a product . . . may select his customers, and for this purpose he may 'franchise' certain dealers to whom alone, he will sell his goods."), *overruled on other grounds by Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54 (1977); *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29-30 (2d Cir. 2006) (applying rule of reason to grant of exclusive distributor); *Flash Elecs., Inc. v. Universal Music &*

---

[8]     Moreover, nothing in the draft exclusivity provision bars nFinanSe from distributing its *GPR cards* (as opposed to its reload packs) directly to any retailers.

*Video Distribution Corp.*, 312 F. Supp. 2d 379, 386 (E.D.N.Y. 2004) ("Courts have refused to place exclusive distributorship agreements within the category of *per se* restraints . . . ."). Accordingly, nFinanSe's new allegations regarding the exclusivity provision do not support a claim for a *per se* illegal horizontal price-fixing conspiracy and reinforce that the rule of reason is the appropriate standard.[9]

## B. As a Matter of Law, nFinanSe's Claim for Breach of Contract (Count One) Must be Dismissed

### 1. nFinanSe's claim for breach of the Alleged Visa Agreement is barred by the Statute of Frauds

The allegations in the SAC related to nFinanSe's claim for breach of the Alleged Visa Agreement are virtually identical to the FAC. The SAC adds no new

---

[9]     Furthermore, nFinanSe's allegations regarding acts of "retaliation" do not make the executed Reload Services Agreements any more horizontal or *per se* illegal. nFinanSe alleges that InComm's decision not to approve additional Retailers' requests to carry the Visa GPR Cards was based on "nFinanSe's refusal to enter into the Reload Network in violation of federal antitrust laws," SAC ¶ 116, and that alleged placement of nFinanSe's products at the bottom of a card rack at one retail location is "punish[ment]" for nFinanSe's refusal "to raise its prices or join InComm's Vanilla Reload Network," *id.* ¶ 68. Any unilateral decision by InComm as to its relationship with nFinanSe, including a unilateral refusal to deal with nFinanSe, is analyzed under the rule of reason. *See Winter Hill Frozen Foods & Servs., Inc., v. Haagen-Dazs Co.*, 691 F. Supp. 539, 544 (D. Mass. 1988); *see also Seagood Trading Corp. v. Jerrico*, Inc., 924 F.2d 1555, 1567 (11th Cir. 1991) (applying rule of reason to defendant's refusal to deal and explaining that "a party 'may choose with whom he will do business and with whom he will not do business,' and . . . this behavior . . . will not give rise to liability absent a showing of actual competitive injury") (quoting *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 772-73 (11th Cir. 1983))).

17

allegations to attempt to show that the terms of the Alleged Visa Agreement that nFinanSe seeks to enforce were reduced to writing, nor does the SAC plead part performance of those terms.  At the March 7, 2012, hearing, the Court noted that although there was "some evidence of partial performance . . . , what was going to be the term of [the Alleged Visa Agreement] that there was partial performance of is a big question mark.  And that may be fatal."  Hrg. Tr. 140:23-141:1.  The SAC leaves that "big question mark" unanswered and InComm respectfully submits that such a defect is, in fact, fatal for the reasons set forth in the briefing on InComm's Motion to Dismiss the FAC and incorporated by reference herein.  Accordingly, the Alleged Visa Agreement is barred by the Statute of Frauds.

### 2.   *nFinanSe's ancillary breach of contract theories also fail as a matter of law*

As in the FAC, the SAC alleges that InComm "breached all of its contracts with nFinanSe."[10]  SAC ¶ 91.  nFinanSe fails to specify which provisions of which "contracts" it alleges were breached and fails to allege that it has suffered any damage whatsoever from the alleged breaches.  Even prior to *Twombly*, such elementary allegations were required to state a breach of contract claim.  *See, e.g.,*

---

[10]   Notably, in nFinanSe's Opposition to InComm's Motion to Dismiss the FAC, nFinanSe devoted a single, conclusory footnote to the defense of these theories.  *See* Dkt. #27 at 16 n.15.

*Adkins v. Cagle Foods JV, L.L.C.*, 411 F.3d 1320, 1327 (11th Cir. 2005) (affirming dismissal of contract claim because plaintiff could not identify a contractual provision defendant breached); *Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1369 (N.D. Ga. 2006) (same).   After *Twombly*, such allegations are all the more essential.   *See Yai v. Progressive Bayside Ins. Co.*, No. 1:08-CV-1369-JOF, 2009 WL 383362, at *7 (N.D. Ga. Feb. 12, 2009) (stating that plaintiff's pleading "at the very least . . . must point to specific provisions of the policy" that plaintiff claims defendant breached).   Moreover, to the extent that nFinanSe's ancillary theories purport to provide a basis for a claim for breach of the Alleged Visa Agreement, they are barred by the Statute of Frauds.

### C.   As a Matter of Law, nFinanSe's Promissory Estoppel Claim (Count Three) Must be Dismissed

The SAC adds two allegations in an effort to save its promissory estoppel claim.   Neither allegation changes the fact that the claim should be dismissed.

First, the SAC attempts to provide a plausible explanation for the hopelessly conflicted allegations of a "case-by-case" approval process in which InComm was unconditionally obligated to provide approval.   The SAC repeats the allegation in the FAC that the purpose of the case-by-case approval process was to "prevent InComm from distributing nFinanSe's GPR Cards, at nFinanSe's behest, to stores that did not want them."   SAC ¶ 36.   As set forth in InComm's Motion to Dismiss

19

the FAC, this purported purpose is implausible in light of the fact that the *Retailers initiated the approval process* by submitting a request to InComm to carry the Visa GPR Cards, *see id.* ("[A]ny retailer wanting to offer nFinanSe's GPR Cards must submit a written request to InComm."). The SAC adds an allegation that InComm required the case-by-case approval process to "protect itself from a promise by nFinanSe that InComm would begin card distribution with insufficient lead time for InComm to be ready to proceed." *Id.* As with nFinanSe's other contrived "explanations," this explanation is nonsensical. InComm did not need to insulate itself from liability related to a promise *by nFinanSe* to retailers. And even if InComm did need such protection, the alleged oral promise in the SAC between InComm and nFinanSe would not have provided it.

Second, nFinanSe attempts to plead that it reasonably relied on the alleged promise to distribute its Visa GPR Cards to all retailers that requested them. "Promissory estoppel requires that reliance on the promise be reasonable." *Johnson v. Univ. Health Servs.*, 161 F.3d 1334, 1341 (11th Cir. 1998). nFinanSe suggests that its reliance was reasonable because (i) nFinanSe "executed and performed the same type of contract" with an unidentified "GPR card distributor" and (ii) because orally adding distribution of the Visa GPR cards to the Discover Card Distribution Agreement "was not an unusual industry practice." SAC ¶ 41.

20

Here, nFinanSe's purported reasonable reliance is implausible because the e-mails attached as Exhibit E to the SAC plainly refute the alleged promise.  In Exhibit E, InComm clearly stated that it had to review each Retailer's request to "insure it me[t] the parties' collective strategic goals."  *Id.*, Ex. E.  The only reasonable inference to be drawn from this e-mail is that nFinanSe knew that InComm did not have to distribute the Visa GPR Cards to every requesting Retailer.  Accordingly, nFinanSe's promissory estoppel claim should be dismissed with prejudice.

### III.   CONCLUSION

For the foregoing reasons, the SAC fails as a matter of law.  InComm respectfully requests that the Court dismiss the SAC in its entirety *with prejudice* as this is nFinanSe's *third attempt* to state a viable claim against InComm.  *See Klusmeier*, 2012 WL 555736, at *4.

[SIGNATURE ON FOLLOWING PAGE]

21

This 10th day of May, 2012.

/s/ Van A. Anderson
DEBRA D. BERNSTEIN
Georgia Bar No. 054998
VAN A. ANDERSON
Georgia Bar No. 100134
MELISSA MAHURIN WHITEHEAD
Georgia Bar No. 667932

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
TEL:  (404) 881-7000
FAX: (404) 881-7777
debra.bernstein@alston.com
van.anderson@alston.com
melissa.whitehead@alston.com

*Counsel for Defendant*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1</u>

The undersigned counsel certifies that the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT was prepared with one of the font and point selections approved by the Court in Local Rule 5.1.

<u>/s/ Van A. Anderson</u>
VAN A. ANDERSON
Georgia Bar No. 100134

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
TEL:  (404) 881-7000
FAX: (404) 881-7777
van.anderson@alston.com

*Counsel for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| NFINANSE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C.A. No. 1:11-CV-3728-AT |
| | ) | |
| INTERACTIVE | ) | |
| COMMUNICATIONS | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this 10th day of May 2012 electronically filed the

foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

PLAINTIFF'S SECOND AMENDED COMPLAINT with the Clerk of Court

using the CM/ECF system, which will automatically send an e-mail notification of

such filing to the following attorneys of record for Plaintiff:

H. Lamar Mixson
Bondurant, Mixson, & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3417

/s/ Van A. Anderson
VAN A. ANDERSON